IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

               Plaintiff,

vs.                                              Crim. No. 13-3516 MCA

OSCAR CASILLAS-NUNEZ,

               Defendant.

## **ORDER**

This case comes before the Court on Defendant Oscar Casillas-Nunez's Motion to Suppress [Doc. 55]. The Court has considered the written submissions of the parties, the evidence adduced at the July 2014 evidentiary hearing, the record in this case, and the applicable law, and is otherwise fully advised.

**Background**

The Court finds as follows:[1]

The DEA routinely obtains from Amtrak information about the travel plans of private citizens. [Doc. 64 at 18] This information is then compared against a drug courier profile. [*Id.*] DEA Special Agent Kevin Small determined that two Amtrak ticket holders, Defendant and co-Defendant Gilbert Rosales, fit the DEA's drug courier profile. [Doc. 64 at 20] SA Small alerted DEA Special Agent Jarell Perry that two passengers fit the DEA's

---

[1] These facts are drawn from SA Perry's Report of Investigation [Ex. A-1] supplemented by the testimony of SAs Small and Perry given at the July 2014 evidentiary hearing.

drug courier profile. [*Id.*]  Agents Small and Perry decided to meet the eastbound Amtrak

passenger train when it stopped at the Albuquerque Amtrak station on October 16, 2013,

the date that Amtrak records indicated that Defendants would be passing through

Albuquerque on the eastbound passenger train.

SA Perry arrived first.  He boarded the train and located Defendant in the

observation car.  [Ex. A-1 at 4] SA Perry was speaking with Defendant when SA small

arrived.  SA Small monitored the encounter from a few feet away.  There is no dispute

that at this point Defendant's encounter with SA Perry was consensual.  SA Perry asked to

see Defendant's ticket.  Defendant produced  a ticket folder containing tickets in the

names Oscar Nunez and Gilbert Rosales.  Defendant admitted that he was traveling with

his "buddy." SA Perry asked Defendant if his buddy was Gilbert Rosales, the person

whose name appeared on the tickets.  Defendant answered "Yeah."  SA Perry asked

Defendant about his travel plans.  SA Perry asked Defendant if he would show SA Perry

where Defendant was seated.  Defendant and the agents left the observation car and

walked to passenger car No. 412. SA Perry asked Defendant where he was seated.

Defendant identified an aisle seat, five or six rows back from the front of the car.  SA

Perry asked Defendant where his friend was seated.  Defendant pointed to a seat directly

behind his seat. SA Perry began ask Defendant for permission to search his luggage.

Before SA Perry could finish his question, Defendant said "Yeah, sure" and removed a

blue duffel bag from the overhead luggage compartment, handing it to SA Perry.  SA

Perry searched the duffel bag, but did not find any contraband.  There is no dispute that

Defendant consented to a search of his luggage. As SA Perry was searching Defendant's

2

luggage, the agents overheard part of a cell phone conversation between Defendant and another person.  Defendant was heard saying "Hey, where's the place, are you in the restrooms or what, okay, okay." [Ex. A-1 at 8; Doc. 64 at 100]  Defendant immediately asked if he could go to the restroom "real quick."  SA Perry responded that he would prefer Defendant to remain until SA Perry finished repacking Defendant's duffel bag. Defendant agreed to wait.  SA Perry finished repacking the bag and returned it to Defendant. SA Perry asked Defendant if he had located his friend. Defendant replied "I tried to, but I guess I lost the call."  SA Perry asked Defendant for permission to search Defendant's person.  Defendant consented. SA Perry searched Defendant, but did not find any contraband.  Defendant then asked if he now could go to the restroom.  SA Perry told Defendant that he was free to go where he wished.  Defendant walked away, headed downstairs to the restrooms.

After Defendant left the passenger compartment, SA Perry spoke with SA Small. SA Small told SA Perry that Defendant had been text messaging as SA Perry searched Defendant's duffel bag.  SA Perry spoke to two of the passengers in car No. 412.  One of the passengers contradicted Defendant's statement that his companion had been sitting directly behind Defendant.  According to the passenger, Defendant's companion had been sitting in an aisle seat one row behind and across the aisle from Defendant's seat.  The passenger also provided a description of Defendant's companion:  Hispanic male, in his 30's, mustache and black hair with a widow's peak.   The agents took turns searching the train for Rosales.  After about 45 minutes, Defendant came out of the restroom and

returned to the observation car. The agents decided to remain on the train when it departed in order to continue their search for Rosales.

After the train departed Albuquerque, SA Perry returned to car No. 412.  He observed a black duffel bag in the overhead luggage compartment directly across the aisle from Defendant's seat and directly in front of the seat where the passenger witness had recalled Defendant's companion sitting.  SA Perry removed the bag from the luggage compartment.  The bag did not have a name tag attached.  SA Perry walked from the front of the passenger car to the rear, showing the bag to each passenger.  No one claimed ownership of the bag.  SA Perry took the bag to the observation car and showed it to Defendant.  Defendant told SA Perry that the bag did not belong to him or his traveling companion.  Defendant told SA Perry that his friend had a red bag and that the friend had the bag with him.  SA Perry asked Defendant to show him his tickets again.  Defendant handed his ticket folder to SA Perry.  SA Perry asked Defendant if he was traveling with Gilbert Rosales.  Defendant told agent Perry that Rosales was his friend, who he had known for a couple of years.

SA Perry decided to treat the black duffle bag as abandoned property and proceeded to search the bag.   Inside were men's clothing and a laptop case.  Inside the laptop case were four gift-wrapped "bundles."  SA Perry opened one of the bundles.  He discovered a white powdery substance.   The packaging of the substance was consistent with SA Perry's experience with kilogram amounts of cocaine.  Also inside the bag were Amtrak tickets and an airline receipt, all in the name of Gilbert Rosales.

The agents handcuffed Defendant, placing him under arrest.  SA Perry observed Defendant's cell phone on the table in front of Defendant.  SA Perry seized the phone and viewed various text messages and phone numbers.  A 10:45 a.m. incoming message referred to a "package," and admonished Defendant to look out for homeland security: "My man this next stop is 45 minutes, im staying on board to take care of the package, get off the train and keep trucha for an undercover or homeland security and keep me posted." An outgoing message advised the recipient that "They are cheching me out home land." Subsequent incoming messages include admonishments to stay calm and advice on how to deal with the narcotics agents.  A 12:41p.m. incoming message instructs Defendant to "Get off at lamy ill meet up with u there k."

SA Perry obtained a warrant for the search of Defendant's cell phone on October 25, 2013, nine days after the warrantless search.

**Discussion**

There is no dispute that in the wake of *Riley v. California*, 134 S. Ct. 2473 (2014), SA Perry's warrantless search of Defendant's cell phone cannot be justified as a search incident to arrest.  The Government argues that the warrantless search was justified by exigent circumstances, or alternatively, that if the search was unlawful, the fruits of the search are excepted from the exclusionary rule by either the inevitable discovery exception,  or SA Perry's good faith reliance on then-existing law.  Having considered the arguments for and against suppression, the Court concludes that Defendant's motion is most readily resolved by application of the "inevitable discovery" exception to the exclusionary rule.   The inevitable discovery exception permits the admission of evidence

5

seized in violation of the Fourth Amendment[2] if a lawful police investigation inevitably

would have discovered it.  *United States v. Christy*,  739 F. 3d 534, 540 (10th Cir. 2014).

The Court is persuaded that in a hypothetical past in which the warrantless search[3]

did not occur, the cell phone inevitably would have been searched pursuant to a warrant.

First, based on the information known to him, SA Perry clearly had probable cause to

believe that Defendant was conspiring with his traveling companion, Gilbert Rosales, in

the transportation of the narcotics SA Perry had discovered in Rosales' duffel bag.[4]

Second, SA Small had observed Defendant sending text messages using his cell phone and

SA Perry had overheard Defendant speaking to someone using his cell phone. When SA

Perry asked Defendant if he had located his friend—clearly a reference to Rosales—

Defendant replied "I tried to, but I guess I lost the call."  Based on this information, the

agents clearly had probable cause to believe that it was Rosales with whom Defendant had

been speaking and texting using the cell phone, and that evidence of these

communications might be preserved in the memory of Defendant's cell phone.  Thus,

---

[2] At the time SA Perry searched Defendant's cell phone, he knew that due to the cell phone blackout in Lamy and the necessity of waiting for the westbound train  he would not be able to act on any information recovered from Defendant's cell phone for several hours, during which time Rosales could have made good his escape. In view of these circumstances, it is not at all clear to the Court that an immediate warrantless search of Defendant's cell phone was a constitutionally reasonable alternative to securing the phone and promptly obtaining a search warrant once SA Perry arrived back in Albuquerque. The Court need not decide this difficult issue, since, as explained below, even if the warrantless search were unlawful, the information obtained during the warrantless search inevitably would have been discovered in the course of a search pursuant to a warrant.

[3] The DEA appears to have conducted two warrantless searches of Defendant's cell phone: the search immediately incident to Defendant's arrest and a second search prior to applying for a ping warrant. This second warrantless search is documented by a phone examination report showing the text messages sent from and received by Defendant's phone on October 15-16, 2013 [Ex. 2]. This report  is dated "10/17/13 00:37:19 GMT." Allowing for the six hour time difference between GMT and MDT, the report would have been generated at 6:37 p.m. MDT on October 16, 2013.  The Court does not understand Defendant to be separately challenging the second warrantless search.

[4] The Court understands Defendant to have conceded that he lacks standing to object to the search of Rosales' bag. As found above, Defendant disclaimed any interest in the black duffel bag.

6

even without the information obtained in the course of the unlawful search of Defendant's cell phone, the information known to the agents at the point that they seized Defendant's cell phone would have provided probable cause for a warrant to search Defendant's cell phone for evidence of a narcotics conspiracy.  The likelihood that a forensic examination of the cell phone would discover evidence linking Defendant to Rosales was too obvious to have been ignored by a reasonably competent narcotics agent. The Court is convinced that if SA Perry had seized the cell without searching it incident to Defendant's arrest and tagged it into evidence, in the normal course of the investigation the cell phone inevitably would have been subjected  to a forensic examination pursuant to a search warrant. [Doc. 65 at 8-9] The subsequent course of events in the present case suggests this is so:  the cell phone in fact was examined pursuant to a search warrant.  [Doc. 65 at 189-90]

The Court of Appeals has identified four factors that it believes may aid a district court in determining whether evidence initially discovered in the course of an illegal search would have been discovered pursuant to a warrant had the illegal search not occurred:  (1)  "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; (2)  the strength of the showing of probable cause at the time the search occurred; (3) whether a warrant ultimately was obtained, albeit after the illegal entry; and (4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli." *United States v. Souza*,  223 F.3d 1197, 1204 (10th Cir. 2000) (quoting *United States v. Cabassa*, 62 F.3d 470, 473-74 (2d Cir. 1995)) (quotation marks and citations omitted).  Factor number one appears to weigh against the

7

Government:  based on training provided by an Assistant United States Attorney, SA

Perry believed that he could search the phone without a warrant incident to Defendant's

arrest, and therefore SA Perry did not take any steps to obtain a warrant prior to search

Defendant's cell phone. Factors two and three weigh in favor of the Government:  the

agents were aware of facts providing adequate grounds for obtaining a warrant at the time

the illegal search occurred and a search warrant ultimately was obtained.  As to factor

four, there is nothing to indicate that the agents "jumped the gun" because of doubts about

their ability to establish probable cause to search the cell phone.  As of October 16, 2013,

when SA Perry conducted the warrantless search,  *Riley* had not been decided, and a

reasonable officer would have had good grounds to believe that probable cause to arrest

was all that was required to justify a warrantless search of Defendant's cell phone and that

a separate showing of probable cause to search the cell phone was unnecessary.  *Silvan W.*

*v. Briggs*,  309 Fed. Appx. 216, 225 (10th Cir. 2009).[5]

      The Court is concerned that the standards for applying the inevitable discovery

exception will continue to be relaxed, *see United States v. Larsen*, 127 F.3d 984 (10th Cir.

1997) (rejecting requirement that independent investigation that would have inevitably

resulted in discovery of evidence have been underway when unlawful search occurs);

*Christy*, 739 F.3d at 540-41 (dispensing with requirement of an independent, lawful police

investigation); *id.* at 543 (holding that preliminary steps to obtain a warrant are merely a

factor to be considered, not a "prerequisite" to application of  inevitable discovery

---

[5]In *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011), the Supreme Court recognized an exception to the
exclusionary rule for "[e]vidence obtained during a search conducted in reasonable reliance on *binding* precedent."
(Emphasis added.).  As a non-binding unpublished decision, *Silvan W.* cannot provide the predicate for application of
the *Davis* exception.

exception), to the point that it may become more realistic to refer to a warrant option rather than a warrant requirement.   Notwithstanding the Court's concerns, under the current state of the law the Court is constrained to hold that the evidence discovered by SA Perry's initial warrantless search of Defendant's cell phone is admissible under the inevitable discovery exception to the exclusionary rule.

**WHEREFORE, IT HEREBY IS ORDERED** that  Defendant Oscar Casillas-Nunez's Motion to Suppress [Doc. 55] is **denied**.

So ordered this 1st day of December, 2015.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge